IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable R. Brooke Jackson

Civil Action No. 12-cv-01011-RBJ

RONDALD N. FRICKEL, O/B/O MARIJEAN E. ABBOTT,

    Plaintiff,

v.

CAROLYN W. COLVIN[1], Acting Commissioner of the Social Security Administration,

    Defendant.

---

ORDER

---

This matter is before the Court on review of the Commissioner's decision denying Marijean Abbott's application for Disability Insurance Benefits pursuant to Title II of the Social Security Act. Ms. Abbott passed away on July 25, 2009. Her husband, Ronald Frickel was substituted as the proper party. Jurisdiction is proper under 42 U.S.C. § 405(g). This dispute became ripe for decision by this Court upon the filing of plaintiff's Reply Brief on October 9, 2012.

**Standard of Review**

This appeal is based upon the administrative record and briefs submitted by the parties. In reviewing a final decision by the Commissioner, the role of the District Court is to examine the record and determine whether it "contains substantial evidence to support the [Commissioner's] decision and whether the [Commissioner] applied the correct legal standards."

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, and thus her name is substituted for that of Michael J. Astrue as the defendant in this suit. Fed.R.Civ.P. 25(d)(1). By virtue of the last sentence of 42 U.S.C. § 405(g), no further action needs to be taken to continue this lawsuit.

*Rickets v. Apfel*, 16 F.Supp.2d 1280, 1287 (D. Colo. 1998). A decision cannot be based on substantial evidence if "it is overwhelmed by other evidence in the record. . . ." *Bernal v. Bowen,* 851 F.2d 297, 299 (10th Cir. 1988). Substantial evidence requires "more than a scintilla, but less than a preponderance." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2007). Evidence is not substantial if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

**Procedural History**

Ms. Abbott first applied for benefits in September 2007. Her alleged onset date of disability is January 1, 2006 and she last met the insured status requirements of the Social Security Act on December 31, 2007. This means that to be eligible for disability benefits, Ms. Abbott must have been disabled prior to December 31, 2007. Ms. Abbott was born on April 10, 1956 and was 49 years old at the alleged onset date of her disability.

Ms. Abbott's initial application was denied in February 2008. After obtaining representation, Ms. Abbott, through counsel, requested to file an appeal out of time. Ms. Abbott died on July 25, 2009. On January 26, 2010 the Appeals Council granted Ms. Abbott's request to file an appeal out of time and instructed the Administrative Law Judge (ALJ) to provide the substituted party, Ronald Frickel, a hearing. Hearings were held on April 19, 2010 and June 7, 2010. Mr. Frickel, a vocational expert, and two medical experts testified. After the hearings, on August 2, 2010, the ALJ issued an order finding that Ms. Abbott was not disabled on or before her date last insured and thus was not entitled to benefits.

**Facts**

In her application for benefits, Ms. Abbott described both physical and mental impairments that caused her disability. The ALJ found that Ms. Abbott suffered from alcohol

dependency with resulting cirrhosis of the liver and depression.  In her application for benefits, Ms. Abbott also alleged an anxiety disorder and a cognitive disorder.

*Medical Records Between January 1, 2006 and December 31, 2007*

In 2006 Ms. Abbott was seeing Dr. Joseph Herman as her primary care physician.  R. 347-89.  She saw Dr. Hermann in May 2006 because of stomach illness.  R. 375.  An abdominal examination was benign and she tested negative for hepatitis.  R. 375-76.  Dr. Hermann diagnosed acute gastroenteritis, irregular menses, fatigue, and depression.  R. 375.  On a follow-up a few weeks later, Ms. Abbott reported that her depression was much better.  R. 372.

Ms. Abbott saw Dr. Hermann again in June 2006.  Following a blood test, notes from June 22, 2006 state "[n]otify patient that her liver is starting to shut down.  STOP all alcohol now and forever or it will be fatal.  Make [appointment] when she is ready and willing to get help."  R. 383.  In July 2006 Ms. Abbott told Dr. Hermann that she was still drinking alcohol.  R. 368.  In August and October 2006 Dr. Hermann recorded that Ms. Abbott suffered from alcoholism and alcoholic hepatitis.  R. 364, 366.

In December 2006 Ms. Abbott saw Dr. Hermann for a sinus infection.  R. 360.  At that time she reported that she planned to enter an alcohol treatment program at the end of the month. *Id.*  In February 2007 Mr. Frickel called Dr. Hermann's office because Ms. Abbott was drinking much more, screaming, and throwing fits.  R. 357.  Dr. Hermann recommended that Mr. Frickel take Ms. Abbott to the hospital for treatment.  *Id.*

On July 30, 2007 Ms. Abbott was admitted to the emergency room because of jaundice and ascites.  R. 350, 406-07.  At that time, Ms. Abbott reported that her abdominal girth had been increasing for three weeks and that she had never been jaundiced before or had ascites.  R. 406.  An ultrasound showed that Ms. Abbott's liver was enlarged, and the ER physician diagnosed her

3

with alcoholic liver disease. R. 400. The ER doctor noted that her condition was "[g]ood, improved from admission" when she was discharged on August 7, 2007. R. 400. The doctor also found that she was of sound mind at the time of discharge. R. 400.

On August 9, 2007 Ms. Abbott entered a 30 day residential treatment program for alcohol dependency. R. 341-43. Ms. Abbott completed the program and planned to continue to attend Alcoholics Anonymous meetings after discharge. R. 342. At the time of her discharge, Ms. Abbott had no signs or symptoms of significant withdrawal, her mood was stable, and she displayed no symptoms of a thought disorder. R. 342. Ms. Abbott was assigned a Global Assessment of Functioning (GAF) score of 50 both at the time she was admitted and when she was discharged. R. 341.

On September 18, 2007 Dr. Hermann diagnosed alcoholic liver disease, ascites, jaundice, weight loss, and depression. R. 347. At a September 21, 2007 appointment, Dr. Pulju stated that Ms. Abbott's condition had stabilized, and a September 28, 2007 liver biopsy showed cirrhosis. R. 445, 453.

*Medical Records After Ms. Abbott's Date Last Insured (December 31, 2007)*

In late January 2008 Ms. Abbott was examined by a psychologist, Dr. Brett Valette. At that time, Ms. Abbott told Dr. Valette that she had not drunk alcohol for two weeks. R. 473. Dr. Valette assigned a GAF score of 50 with alcohol dependency on axis I and cirrhosis and knee pain on axis III. R. 473. He noted that she struggled with short term memory, her general fund of information was average, her abstractions, judgment, and reasoning were fine, and her primary issue was alcohol dependency. R. 473.

In March 2008 Ms. Abbott saw Dr. Hermann and discussed treatment to stop drinking. R. 670. Dr. Herman did not believe that Ms. Abbott was fully committed to stopping drinking

and referred her to an addiction specialist. R. 670. On April 21, 2008 Mr. Frickel took Ms. Abbott to the hospital. R. 476. The hospital records note that in the week prior to hospitalization, Ms. Abbott had decreased responsiveness and increased generalized weakness, incontinence, and decreased self-care. R. 476. Ms. Abbott reported that she was confused at times, angry, and belligerent. R. 476. She was drinking 10-15 drinks per day. R. 476. The hospital diagnosed alcohol cirrhosis. R. 477. A brain scan also showed encephalopathy, atrophy of the brain. R. 483.

On May 16, 2008 Ms. Abbott again entered the hospital. R. 485. At that time her diagnoses included urosepsis; encephalopathy; end-stage liver disease; alcoholic cirrhosis; thrombocytopenia; anemia; renal insufficiency; hyperglycemia; dysphagia; cognitive deficit; significant functional deficit secondary to urinary tract infection, sepsis, encephalopathy; decompensation of end-stage liver disease; ongoing weakness; and ongoing need for 24 hour care. R. 485-86. Ms. Abbott remained in the hospital, in the rehabilitative unit, through June 6, 2008. R. 486, 488. At that time, the hospital characterized Ms. Abbott's prognosis as "very poor." R. 488.

In December 2008, Dr. Shauna Casemate, Psy.D, completed a neuropsychological assessment of Ms. Abbott. R. 511-29. Dr. Casemate found that Ms. Abbott's mental impairments included poor memory, mood disturbance, emotional liability, delusions, substance dependence, recurrent panic attacks, paranoia, and difficulty thinking or concentrating. R. 523. Dr. Casemate explained that "[l]iver failure has resulted in a number of severe cognitive and functional impairments. These are largely due to hepatic encephalopathy . . . a condition which causes cognitive deficits in as many as 80% of cirrhosis patients." R. 524. Dr. Casement determined that at the time of the examination Ms. Abbott would be unable to work because she

could not do the following: remember simple instructions, maintain attention and concentration, perform activities within a schedule, work in proximity with others, adhere to standards of cleanliness, or interact appropriately with the public. R. 525.

In January 2009 Ms. Abbott was again admitted to the hospital and remained in inpatient care for about 7 weeks. R. 649. She was admitted to the hospital in April and June of 2009. R. 688. In June, after removing fluid from her abdomen, Ms. Abbott was transferred to hospice care. R. 696, 716. Ms. Abbott passed away on July 29, 2009. R. 716.

*Medical Testimony*

During the administrative hearing, the ALJ heard testimony from two medical experts: Dr. Gayle Humm, a surgeon, and Dr. Robert Pelc, a psychologist. Dr. Humm testified that although Ms. Abbott exhibited some serious symptoms in July 2007, there was evidence of some recovery after that time. R. 86. Dr. Humm testified that based on the medical evidence in the record, she believed that Ms. Abbott's condition deteriorated in April of 2008. R. 87. She testified that prior to Ms. Abbott's hospitalization in July 2007, Ms. Abbott would not have had any work related restrictions because of her liver disease. R. 87. After the July 2007 hospitalization, Dr. Humm believed that Ms. Abbott would have been limited to lifting no more than 20 pounds occasionally and 10 pounds frequently, standing and walking no more than an hour at a time for a total of no more than four hours per day, climbing stairs or ramps occasionally, never climbing scaffolds and ladders, and limiting bending and stooping to occasionally. R. 89-92.

Similarly, Dr. Pelc testified that Ms. Abbott's mental functioning did not meet the listing criteria before December 2007, but that the record showed a consistent decline in her overall functioning. R. 46. Dr. Pelc testified that prior to her death, Ms. Abbott showed marked

restrictions in all of her functioning areas.  R. 47.   Dr. Pelc opined that prior to December 31, 2007, Ms. Abbott had the following limitations: mild limitations in understanding, remembering, and carrying out simple instructions; moderate limitations in understanding, remembering, and carrying out complex instructions; moderate limitations in making judgments on complex, work related decisions; moderate limitations in interacting appropriately with others; and moderate limitations in adjusting to usual work situations and changes in a routine work schedule.  R. 47-48.

*ALJ's Decision*

In his decision, the ALJ relied on the five step sequential analysis required by the social security regulations.  At step one of the analysis, the ALJ determined that Ms. Abbott did not engage in substantial gainful activity after her alleged onset date of January 1, 2006 through her date last insured on December 31, 2007.  R. 20.  At step two, the ALJ determined that Ms. Abbott suffered from two severe impairments: cirrhosis of the liver and depression.  R. 21.  At step three of the analysis the ALJ found that Ms. Abbott did not meet the listing criteria of liver disease under 5.05 or mental impairments under 12.04 and 12.09.  R. 21-22.  In reaching this conclusion, the ALJ relied on the testimony of Drs. Humm and Pelc.  R. 21-22.

Before completing steps four and five of the sequential analysis, the ALJ determined Ms. Abbott's residual functional capacity (RFC).  The ALJ found that through December 31, 2007, Ms. Abbot was able to perform work activities with the following limitations: she could sit without restriction; she could stand or walk for one hour at a time for no more than 4 hours in an 8 hour work day; she could lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently, she could occasionally climb stairs, balance, stoop, kneel and crouch; she should avoid climbing ladders and scaffolds, crawling, exposure to unprotected heights, moving parts,

7

and driving; she had mild deficits in her ability to carry out, understand, and remember simple instructions and to make judgments on simple decisions; she had moderate deficits in her ability to carry out, understand, and remember complex instructions and make judgments on complex decisions, in her ability to interact with coworkers, supervisors and the public and in her ability to adjust to usual work situations. R. 23. In arriving at this RFC, the ALJ gave great weight to the opinions of Drs. Humm and Pelc. R. 27-29. The ALJ also found that the testimony from Mr. Frickel and written statements from Ms. Abbott were not completely credible. R. 24-25.

Based on this RFC, the ALJ determined at step four that Ms. Abbot could not perform her past relevant work as a vice president of marketing, freelance writer, or advertising sales representative. R. 29. At step five of the analysis, based on the testimony of a vocational expert, the ALJ determined that there existed jobs in the national economy that Ms. Abbott could perform based on her age, education, work experience, and residual functional capacity. R.29-30. Because work existed in the national economy that Ms. Abbott could have performed, the ALJ determined that she was not disabled before her date last insured.

**Analysis**

In his brief, Mr. Frickel alleges that the ALJ made the following errors in his decision denying Ms. Abbot benefits: (1) the ALJ did not properly consider Ms. Abbott's subjective impairments; (2) the ALJ failed to properly assess the credibility of Ms. Abbott and Mr. Frickel; (3) the ALJ did not properly weigh the medical opinions of Dr. Ritvo, Dr. Valette, and Dr. Casemate; (4) the ALJ failed to consider all of Ms. Abbott's impairments in combination; (5) the ALJ improperly required contemporaneous medical records; and (6) the ALJ failed to consider that Ms. Abbott was quickly approaching retirement age.

<u>The ALJ's Consideration of Ms. Abbott's Subjective Impairments</u>

Mr. Frickel argues that the ALJ did not properly apply the three step process articulated in *Luna v. Bowen,* 834 F.2d (10th Cir. 1987), in evaluating Ms. Abbott's subjective impairments. In *Luna,* the Tenth Circuit examined the roles of objective and subjective evidence in considering pain. The court held that when an ALJ assess whether a claimant's assertions of subjective pain rise to the level of a finding of disability, a three step process should be followed. *Id.* at 163. First, the ALJ must rely on objective evidence to determine whether there is a pain producing impairment. *Id.* Next, the ALJ should examine the relationship between the pain producing impairment and the pain alleged. *Id.* At this phase, the ALJ accepts the claimant's pain allegations as true. *Id.* If the ALJ determines that there is a relationship between the pain producing impairment and the pain alleged — whether the impairment could reasonably be expected to cause the pain alleged — the ALJ moves to the third phase. *Id.* In the third phase, the ALJ can rely on both objective and subjective evidence to determine whether the pain is disabling. *Id.* It is at this stage where the ALJ considers the claimant's credibility. *Id.*

Mr. Frickel argues that several of Ms. Abbott's alleged impairments are analogous to subjective complaints of pain and thus should have been examined under this same three step framework. Specifically, Mr. Frickel argues that Ms. Abbot's complaints of chronic fatigue, cognitive deficits, memory problems, confusion, and emotional collapse should have been examined using the *Luna* framework, and that the ALJ failed in this analysis.

In his analysis, the ALJ explained that he followed a process where first he determined whether there was an underlying medically determinable physical or mental impairment that could be shown by medically acceptable clinical and laboratory diagnostic techniques that could reasonably be expected to produce Ms. Abbott's pain or other symptoms. R. 23-24. Next, the

ALJ analyzed the extent to which the underlying physical or mental impairments limited the claimant's functioning. R. 24. At this phase, the ALJ evaluated the intensity, persistence, and limiting effects of the claimant's alleged symptoms. R. 24. The ALJ compared the claimant's statements with objective medical evidence, and when the claimant's symptoms were not supported by medical evidence, the ALJ was forced to make credibility judgments. R. 24. I believe that this standard is consistent with the analysis required by *Luna*.

When a lower tribunal represents to this Court that it did something, it is this Court's practice to take that tribunal at its word. *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005). Mr. Frickel has not provided any evidence to suggest that the ALJ did not undertake the analysis that he described. Further, the ALJ's analysis supports this conclusion. The ALJ confirmed that Ms. Abbott's medically verifiable impairments — alcohol dependency with resulting cirrhosis of the liver and depression — could cause the symptoms that she alleged. R. 24. The ALJ then went through a careful analysis of the available medical evidence and explained why based upon that evidence he did not find credible all of Ms. Abbott's or Mr. Frickel's statements describing Ms. Abbott's limitations. R. 25. Instead, the ALJ found that based on medical reports, Ms. Abbott was capable of performing within the RFC that he described. R. 25. The ALJ applied the correct law and his decision is supported by substantial evidence. Accordingly, there was no error.

<u>Credibility</u>

Related to the previous point is Mr. Frickel's argument that the ALJ did not properly determine the credibility of Ms. Abbott and Mr. Frickel. An appellate court generally gives great deference to the credibility determination of the finder of fact. However, the determination must be supported by substantial evidence. *Kepler v. Chater,* 68 F.3d 387, 391 (10th Cir. 1995). In

his decision, the ALJ carefully compared Ms. Abbott's and Mr. Frickel's reports with the reports and opinions of medical professionals. R. 25. He explained that he did not "find this evidence supportive of the degree of physical or mental limitation alleged by the claimant and her husband during the period of alleged disability . . . ." R. 25. The ALJ's credibility findings are supported by substantial evidence and, therefore, will not be disturbed by this Court.

<u>Weighing of Medical Opinions</u>

Mr. Frickel argues that the ALJ failed to properly weigh the opinions of Dr. Jonathon Ritvo, Dr. Brett Valette, and Dr. Shauna Casemate. Dr. Ritvo was Ms. Abbott's treating psychiatrist during her inpatient treatment in September 2007. R. 341-43. Dr. Valette and Dr. Casemate examined Ms. Abbott and completed reports. Mr. Frickel argues that the ALJ relied heavily on the opinion of Dr. Pelc who testified at the hearing rather than the treating and evaluating psychiatrist and psychologists listed above.

Treating source opinions are generally entitled to controlling weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). Mr. Frickel argues that the ALJ erred by disregarding Dr. Ritvo's opinion. Dr. Ritvo prepared one report on September 20, 2007 after Ms. Abbott completed a month of treatment. R. 341-43. Dr. Ritvo opined that Ms. Abbott had a GAF score of 50 both at the time she was admitted and when she was discharged. R. 341. He diagnosed Ms. Abbott with alcohol dependency and a history of panic and depression. *Id.* At the time of discharge, Dr. Ritvo noted that Ms. Abbott had a stable mood and no symptoms of a thought disorder. R. 342. Dr. Ritvo's report did not include any discussion about work related restrictions for Ms. Abbott.

I disagree with Mr. Frickel's assertion that the ALJ disregarded Dr. Ritvo's opinion. Rather, the ALJ is tasked with examining the medical evidence and determining a claimant's

residual functional capacity.  Looking at the opinion of Dr. Ritvo and the ALJ's opinion, it is clear that the ALJ considered all of the medical evidence, but Dr. Ritvo's opinion provided little detail about appropriate work restrictions for Ms. Abbott.  Because Dr. Ritvo did not provide this type of information in his opinion, and Dr. Pelc did, it was reasonable for the ALJ to rely on the specific opinions of Dr. Pelc that were not inconsistent with Dr. Ritvo.

"The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all."  *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).  Mr. Frickel argues that as examining physicians, the opinions of Dr. Valette and Dr. Casement were entitled to greater weight than the ALJ accorded them.  I disagree.  The ALJ considered Dr. Valette's opinion from January 2008, one month after Ms. Abbott's date last insured.  R. 26.  The ALJ acknowledged that although Ms. Abbott denied any problems with her memory, Dr. Valette diagnosed some impairments.  R. 26.  Dr. Valette's opinion did not include any specific restrictions on work related mental functioning and was not retrospective.  R. 472-73.  Based upon this information, the ALJ concluded that Dr. Valette's report was "not supportive of any greater limitations on work-related mental functioning than found in this decision."  R. 26.  This determination is supported by substantial evidence.

The ALJ also analyzed Dr. Casement's opinion.  In her opinion, Dr. Casement found that Ms. Abbott suffered from significant cognitive deterioration and opined that at the time of the evaluation, December 2008, Ms. Abbott would not be capable of working.  R. 525.  Dr. Casement also found that Ms. Abbott's cognitive functioning had been declining.  R. 527.  She did not offer any opinions as to Ms. Abbott's cognitive abilities prior to February 2008.  R. 511-29.  Because Dr. Casement's evaluation of Ms. Abbott did not occur until December 2008, a year

after the date last insured, the ALJ found that Dr. Casement's evaluation did not support a finding of disability before December 31, 2007. The ALJ adequately explained why he accorded little weight to Dr. Casement's opinion, and his decision is supported by substantial evidence.

          Combination of Impairments

Next, Mr. Frickel argues that the ALJ failed to consider the combination of Ms. Abbott's impairments. Multiple times in the opinion the ALJ states that he considered Ms. Abbott's combination of impairments. R. 18-19. Specifically, he states that he considered her combination of impairments in the second and third steps of the sequential evaluation process and in determining Ms. Abbott's RFC. R. 18-19. In this circuit, the general practice "is to take a lower tribunal at its word when it declares that it has considered a matter." *Hackett,* 395 F.3d at 1173. Mr. Frickel has not offered any reason why this Court should not take the ALJ at his word that he considered Ms. Abbott's impairments in combination.

          Requirement of Contemporaneous Medical Records

Mr. Frickel also argues that the ALJ improperly required that Ms. Abbott provide contemporaneous medical records to establish her disability. I disagree. The ALJ's opinion clearly shows that he considered the medical records available to him, both records from the period of disability and subsequent records, to determine whether Ms. Abbott was disabled on or before December 31, 2007. Many of the records relied on were contemporaneous medical records. *See e.g.* R. 25-26, 347-89. Based upon the medical records available and Dr. Humm's analysis of those records, the ALJ determined that prior to July 2007 there was little evidence of physical impairment. R. 27. Beginning July 30, 2007, Ms. Abbott began to suffer from more symptoms of impaired liver function. R. 27. However, the ALJ found that after hospitalization, CDL scores show that her liver function improved. R. 28. After December 31, 2007 there is

evidence that Ms. Abbott's condition became much more dire. Dr. Humm testified that by April 2008 Ms. Abbott had liver disease that would meet the criteria required for listing. R. 87. Mr. Frickel argues that because Ms. Abbott would have met the listing criteria within 84 days of her date last insured, the ALJ erred in not finding disability. Pl.'s Br. 26. However, Ms. Abbott's liver impairment was a progressive disease. Thus, showing that she met the listing in April 2008 does not establish that Ms. Abbott's liver function was so impaired in December 2007 that she would be incapable of substantial gainful activity. Instead, based on the medical evidence and testimony, the ALJ found that in December 2007 Ms. Abbott had only those restrictions described in the RFC. Based upon the evidence available in the record, there is substantial evidence to support his assertion.

### Ms. Abbott's Age

The social security regulations provide three categories of individuals: (1) younger persons, those 49 years and younger; (2) persons approaching advanced age, 50-54 years; and (3) persons of advanced age, 55 and over. *Daniels v. Apfel*, 154 F.3d 1129, 1132 (10th Cir. 1998) (citing 20 C.F.R. 404.1563(d)). Within the category of persons approaching advanced age, there is a subcategory for persons closely approaching retirement age — those 60 and over. 20 C.F.R. 404.1563(e). These categories direct how a person's age will be considered in the vocational analysis. *Daniels*, 154 F.3d at 1132. According to the regulations, for a younger person, the ALJ generally does not consider that age will affect the claimant's ability to adjust to other work, but for a person approaching advanced age, the ALJ "will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work." 20 C.F.R. 404.1563(c) and (d). For a person of advanced age, the ALJ must consider that age significantly affects the person's ability to adjust to other work. 20 C.F.R.

404.1563(e). The transferability of skills is even more limited for those persons approaching retirement age. 20 C.F.R. 404.1568(d)(4).

In his briefing, Mr. Frickel argues that Ms. Abbott was quickly approaching retirement age and her claim should have been analyzed as such. Pl.'s Br. 27-29. However, at the alleged onset date of Ms. Abbott's disability, she was 49 years old and on the date last insured she was 51 years old. R. 29. This makes her a younger person for part of the disability period and a person approaching advanced age for the latter part. *Id.* The ALJ determined that Ms. Abbott would not be able to perform her last relevant work. *Id.* Therefore, the burden shifted to the ALJ at step five to establish that Ms. Abbott could perform other work in the national economy. The ALJ relied on the opinion of a vocational expert to determine that there were jobs in the national economy that Ms. Abbott could perform. The vocational expert testified that based upon Ms. Abbott's age, education, work experience, and RFC, there were jobs which existed in the national economy that she could perform. R. 71-73. Further, in asking the hypotheticals, the ALJ specifically pointed out that Ms. Abbott was a person approaching advanced age for part of the disability period. R. 71. Because the hypothetical posited to the vocational expert contained the limitation that Ms. Abbott was a person approaching advanced age, the heightened standard was considered in determining that Ms. Abbott was capable of work. The ALJ therefore did not fail to consider Ms. Abbott's age.

**Conclusion**

After examining the ALJ's opinion, the record, and briefing from both parties, I am satisfied that the ALJ's opinion applies the correct legal standards and is based on substantial evidence. Although the record makes clear that Ms. Abbott's health precluded her from working beginning in mid-2008, substantial evidence supports that ALJ's conclusion that through her date

last insured, December 31, 2007, neither liver disease nor depression prevented Ms. Abbott from substantial gainful activity.

This is a sad case. The Court can relate to it somewhat on a personal level, having had a mother who was unable to stop drinking despite warnings until it became too late to reverse the damage. The Court wishes that it could do better for the petitioner, but the facts and law did not permit it. I extend my sympathies to Mr. Frickel for this tragic loss and wish him nothing but the best.

**Order**

The decision of the Commissioner is AFFIRMED.

DATED this 1st day of July, 2013.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge